COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-045-CR

 

 

DANTONIO M. SWANSON                                                    APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








A jury convicted appellant
Dantonio M. Swanson of murder and assessed punishment at 10 years= confinement.  In a single
point, appellant complains that the evidence is legally insufficient to support
the jury=s conclusion that he did not act in self-defense.  Specifically, appellant contends that he was
justified in using deadly force because he believed the victim had a gun and
was about to shoot him.  We affirm. 

 A person commits the offense of murder if he
intentionally or knowingly causes the death of an individual, or intends to
cause serious bodily injury and commits an act clearly dangerous to human life
that causes the death of an individual.[2]  However, a person is justified in using
deadly force against another if he reasonably believes that it is necessary to
protect himself against the other=s use or attempted use of unlawful force, and a reasonable person in
the actor=s situation
would not have retreated.[3]









The defendant has the burden
of producing some evidence to support a claim of self‑defense.[4]
Once the defendant produces that evidence, the State then bears the burden of
persuasion to disprove the raised defense.[5]  This burden does not require the State to
introduce evidence disproving the defense; rather, it requires only that the
State prove its case beyond a reasonable doubt.[6]  When a jury finds the defendant guilty, this
is an implicit finding against the defensive theory.[7]

When reviewing the legal
sufficiency of the evidence in the context of the jury=s rejection of a defense, we ask whether, after viewing all the
evidence in the light most favorable to the prosecution, any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt and also could have found against appellant on the defensive issue beyond
a reasonable doubt.[8]  The issue of self-defense is a fact issue to
be determined by the jury, which is free to accept or reject all or part of the
defensive evidence.[9]








The evidence at trial showed
that appellant and the victim, Ryan Latigo, had a contentious relationship that
had existed for months before the shooting. 
In October 2003, Latigo moved into a duplex with Kamiean Kimble,
appellant=s
ex-girlfriend, and appellant=s young daughter, Karrigan. 
Appellant, upset by these living arrangements, often exchanged
profanities and threats with Latigo when he went to Kimbell=s duplex to pick up Karrigan. 
Appellant also argued with Kimble about Latigo=s presence in the home and once told her that Athe only reason that [Latigo] was still living was because [appellant]
allowed him to.@

On August 12, 2004, appellant
arrived early to pick up Karrigan and began to bicker with Kimble about child
support.  The conversation escalated and
eventually awoke Latigo, who had been asleep in the bedroom.  Latigo and appellant argued, and both Latigo
and Kimble ordered appellant to leave. 
Latigo stood in the doorway to watch as appellant, trailed by
two-year-old Karrigan, left the duplex. 
Both men continued Atrash talking@ to each
other while appellant walked to his car.        

Reaching his car, appellant
opened the trunk and pulled out a 12-gauge pump shotgun.  Stepping toward Latigo, appellant told
Karrigan, ABaby, move
out of the way real quick.@  Appellant fired one shot into
Latigo=s chest, piercing all four chambers of his heart and two major
arteries.  Latigo stumbled back into the
duplex and collapsed on the kitchen floor. 
Appellant followed Latigo up to the house to see if the shot had hit
him, then took Karrigan and fled.  Kimble
dialed 911 to report the shooting.   








After leaving the scene,
appellant called his father and told him about the shooting, stating, AI had to shoot him.  He kept
coming at me.@  Appellant then drove home to wait for the
police.  When an officer arrived,
appellant walked out to the patrol car and admitted, AI=m him, I did
it.@  Appellant did not mention that
he believed Latigo had a weapon or that he shot Latigo in self-defense.  

At trial, appellant testified
and raised the issue of self-defense for the first time.  Appellant said that Latigo outweighed him by
60 to 65 pounds and was always the instigator when the men argued.  Latigo wore colors of a local Blood gang, and
he and other members of the gang once tried to provoke appellant into a
fight.  Appellant said that he never
retaliated against or threatened Latigo.








Appellant also said that on a
previous occasion, Latigo had physically attacked him.  Appellant claimed that Latigo grabbed him by
the throat, pushed him against his car, and threatened to Atake [his] punk ass out now.@  Latigo told appellant that he
was not afraid to Ado time@ because he had been in prison before. 
Appellant believed that Latigo was going to kill him and remained afraid
every time he went to pick up his child. 
Appellant did not call the police after this incident because he feared
that Latigo or members of the Blood gang might retaliate.  Appellant testified that he instead bought a
shotgun for protection, which he carried, loaded, in the trunk of his car. 

On appeal, appellant argues
that no rational jury could have found him guilty of murder because he
testified, without contradiction, that he believed the victim had a gun in his
hand.  Appellant said that on the day of
the shooting, Latigo had followed him out of Kimble=s apartment, shouting that he would Abeat [appellant=s] brains
out@ and Aend this
shit right now.A  Latigo then reached behind his back, which
made appellant believe that Latigo had a weapon.  Appellant testified that he saw a Ashiny metal object@ in Latigo=s hand and
believed Latigo was Agoing to do
something to [him].@








Although appellant claims
that he was reasonably in fear for his life, the evidence was legally
sufficient for the jury to conclude otherwise. 
Evidence at trial showed that Latigo was standing at least 25 feet away
when appellant pulled the gun out of his car trunk.  Appellant, rather than retreating, stepped
toward Latigo and instructed his two-year-old daughter to get out of the
way.  Appellant had only one cartridge in
the gun, which he shot at Latigo. 
Without ammunition to reload, and not knowing whether his shot hit
Latigo or if Latigo was still holding the object appellant believed was a gun,
appellant followed Latigo to the house. 
The jury could have rationally concluded that these actions were
inconsistent with those of a man in fear for his life. Thus, based on appellant=s own testimony, the jury could have determined that appellant was not
reasonably afraid for his life and that deadly force was not immediately
necessary for appellant to defend himself. 

Other testimony supported the
jury=s rejection of appellant=s defense.  Although Appellant
claimed that he had to defend himself because Latigo Akept coming at him,@ Kimble testified that she was pulling Latigo back into the house when
appellant shot him.  She also said that
Latigo=s hands were relaxed at his sides, and not tensed or flexed as if he
was reaching for something.  Kimble did
not allow Latigo to keep a gun in her house, and investigating officers did not
find any weapons at the scene of the shooting. 
Based on this record, the jury acted within its province in accepting
Kimble=s testimony as true and in rejecting appellant=s version of events. 








Finally, appellant undermined
his self-defense claim by repeatedly contradicting himself.  For example, during an interview shortly
after his arrest, appellant told police that he had only intended to frighten
Latigo with the gun, but it Aaccidently fired.@  At trial, however, appellant
testified that he shot Latigo to protect himself because Latigo Akept coming at him.@  Appellant later claimed on
cross-examination that he did not intend to harm Latigo, but had merely fired
the gun to Ascare him
off.@  Given the inconsistency of
appellant=s
statements, coupled with his failure to mention the self-defense claim until
trial, the jury could have found his testimony to be not credible.

While there is some evidence
in the record supporting appellant=s self-defense allegations, there is also evidence from which a
rational jury could have dismissed appellant=s defensive claim.  After
carefully considering the evidence and applying the appropriate standard of
review, we conclude that the evidence is legally sufficient to prove the
essential elements of murder beyond a reasonable doubt and to support the jury=s rejection of appellant=s defensive theory.  

Appellant=s point is overruled, and we affirm the trial court=s judgment.

 

PER CURIAM

 

PANEL
F:  CAYCE, C.J.; GARDNER and WALKER, JJ.

 

DO NOT PUBLISH        

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 7, 2008                              

 

 

 

 











[1]See Tex. R. App. P. 47.4.





[2]Tex. Penal Code Ann. '
19.02(b)(1),(2) (Vernon 2003).  





[3]Id. '' 9.02,
9.31, 9.32 (Vernon 2003). Although sections 9.31 and 9.32 have since been
amended, the offense for which appellant was convicted occurred before the
effective date of the amendments (September 1, 2007) and, therefore, is
governed by the previous version of these statutes.  See Act of March 21, 2007, 80th Leg.,
R.S., ch. 1, '' 5,
6, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment of Tex. Penal Code Ann. ''
9.01, 9.31, 9.32 and Tex. Civ. Prac.
& Rem. Code Ann. ' 83.001). 





[4]Zuliani
v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003);
Saxton v. State, 804 S.W.2d 910, 913B14 (Tex. Crim. App. 1991).





[5]Zuliani, 97
S.W.3d at 594; Saxton, 804 S.W.2d at 913B14; Dotson
v. State, 146 S.W.3d 285, 291 (Tex. App.CFort Worth 2004, pet. ref=d).





[6]Zuliani, 97
S.W.3d at 594; Saxton, 804 S.W.2d at 913; Dotson, 146 S.W.3d at
291.





[7]Zuliani, 97
S.W.3d at 594; Saxton, 804 S.W.2d at 914.





[8]Saxton, 804
S.W.2d at 913; Dotson, 146 S.W.3d at 291.





[9]Saxton, 804
S.W.2d at 913B14; Dotson,
146 S.W.3d at 295.